Richard Lyon (Cal. Bar No. 229288)
rick@dovel.com
Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Attorneys for Plaintiff and the Proposed
Class*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Impressions Restaurant & Banquet Hall Inc., individually and on behalf of all others similarly situated,<br><br>   *Plaintiff,*<br><br>v.<br><br>Liberty Mutual Insurance Company, Liberty Mutual Agency Corporation, and Liberty Mutual Group Inc.,<br><br>   *Defendant.* | Case No. 2:23-cv-733<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

# Table of Contents

I.      Introduction....................................................................................................1

II.     Parties. .........................................................................................................3

III.    Jurisdiction and venue. ..................................................................................5

IV.     Additional allegations. ...................................................................................5

      A.   COVID-19, ensuing health orders, and social distancing mandates
         caused California businessowners, including Liberty Mutual
         policyholders like Impressions Restaurant, to decrease their business
         operations. ...........................................................................................5

      B.   Liberty Mutual was aware that (1) its businessowner policyholders'
         premiums were determined based on pre-COVID-19 information
         and thus provided Liberty Mutual with an inflated rate of return, and
         (2) California public policy required Liberty Mutual to lower or
         refund its premiums accordingly. ........................................................8

      C.   Liberty Mutual unfairly collected and retained excessive premiums
         calculated based on its policyholders pre-COVID-19 operations
         instead of reducing and refunding the premiums to account for its
         policyholders' diminished operations..............................................13

V.      Class action allegations. ..............................................................................15

VI.     Claims .......................................................................................................17

      Count 1: Unjust Enrichment ...............................................................17

      Count 2: Violation of Business and Professions Code § 17200, et seq...................18

VII.    Jury Demand...............................................................................................20

VIII.   Prayer for Relief. ........................................................................................20

# I.      Introduction.

1.      California public policy limits commercial property and casualty insurers like Defendant Liberty Mutual to a fair rate of return based on the premiums they collect from their policyholders.  But, at a time when the COVID-19 pandemic and the attendant public health orders forced insured businesses to shutter or drastically cut operations, Liberty Mutual disregarded this policy.  Liberty Mutual collected and retained excessive insurance premiums, resulting in an inflated rate of return.  Liberty Mutual unjustly profited.  And its businessowner policyholders, like Plaintiff Impressions Restaurant & Banquet Hall, were harmed.  This case seeks to remedy Liberty Mutual's unfair business practice.[1]

2.      Premiums for businessowners insurance are properly calculated based on the risks associated with the volume and nature of a business's operations.  If a business has larger operations—more employees or more customers patronizing the business— then the potential for an insured event increases and the insurer faces more risk.  To maintain a fair rate of return, insurance companies like Liberty Mutual account for the increased risk by charging higher premiums.

3.      Conversely, if a businessowner policyholder has diminished operations— fewer employees and fewer customers (or none at all) patronizing its business—then the potential for an insured event decreases and the insurer faces less risk.  To maintain a fair rate of return, the insurance company must account for the decreased risk and lower or refund premiums accordingly.  Failure to do so will result in an inflated rate of return, unjustly enriching the insurance company and harming the insured.

4.      When COVID-19 began to spread in March 2020, California enforced strict social distancing measures to slow its spread.  California citizens were ordered to shelter in place and only venture outside for essentials.  This forced California businesses—including those insured by Liberty Mutual—to drastically reduce or shut

---

[1]      "Liberty Mutual" refers collectively to Liberty Mutual Insurance Company, Liberty Mutual Agency Corporation, and Liberty Mutual Group Inc.  See ¶¶ 12-16.

down their operations.  Prior to the pandemic, in November 2019, Plaintiff Impressions Restaurant & Banquet Hall, Inc. purchased a businessowners insurance policy from Liberty Mutual, covering its commercial property and general liability.  At that time, Plaintiff ran two successful banquet halls in Glendale, California, with annual sales of over $400,000, a full-time staff of six employees, and dozens of part time contractors.  During the pendency of its policy, in mid-March 2020, Plaintiff was forced to shut down its business and furlough its entire staff.  From March 2020 to March 2021, Plaintiff had no operations, no employees, and no revenue.  During this period of drastically reduced (or nonexistent) operations, Plaintiff was far less likely to experience an insured event, and Liberty Mutual faced significantly less risk.  To maintain a fair rate of return, Liberty Mutual needed to lower premiums accordingly or issue appropriate refunds to Plaintiff, and to all similarly situated policyholders.

5.    The California Department of Insurance confirmed this.  Through a series of formal bulletins issued during 2020 and 2021 (Exhibits 2-6), the California Insurance Commissioner repeatedly ordered insurance companies to provide partial refunds or other monetary relief, such as credits or dividends, to their California policyholders because of their lower loss exposures during the pandemic.  Each bulletin put Liberty Mutual on notice that their then-current rates were excessive.  Nonetheless, Liberty Mutual failed to provide the requisite monetary relief.

6.    For example, in April 2020, Insurance Commissioner Ricardo Lara issued a bulletin to insurers recognizing that "the COVID-19 pandemic … [had] severely curtailed activities of policyholders in both personal and commercial lines," so that "projected loss exposures of many insurance policies have become overstated or misclassified."  Exhibit 2 (2020-3 Bulletin) at 1.  "To protect consumers and to provide consistent direction to the insurance industry regarding misclassifications of risk resulting from the COVID-19 pandemic," Commissioner Lara ordered "insurers to make an initial premium refund … to all adversely impacted California policyholders," including Plaintiff and similarly situated businesses.  *Id.* at 1-2.

2

7.      But Liberty Mutual failed to do so.  Plaintiff, like many other similarly situated businesses insured by Liberty Mutual, was an adversely impacted California policyholder.  Because of the social distancing and stay-at-home measures in effect in California, Plaintiff had either minimal operations or no operations at all for much of the time that its businessowners policy with Liberty Mutual was in place.  And yet it continued to pay 100% of its premiums.  Despite full knowledge of the facts, Liberty Mutual never adjusted Plaintiff's premiums to account for Plaintiff's decreased operations and Liberty Mutual's decreased risk.  No price reduction, and no refunds.  Instead, Liberty Mutual collected and retained excessive premiums from Plaintiff, just as it did from numerous other similarly situated businesses.

8.      Because the rates charged by Liberty Mutual were well in excess of a fair rate of return and Liberty Mutual failed to provide appropriate refunds, Liberty Mutual experienced an unjust windfall.  And Liberty Mutual's businessowner policyholders, who were already suffering diminished operations, were further harmed by Liberty Mutual's excessive premiums.

9.      This lawsuit does not challenge the approved rates, the ratemaking process, or the established fair rate of return.  The rates were established before anyone anticipated a pandemic that would shutter business operations and render the rates excessive.  But, once business operations were curtailed and the rates became excessive, Liberty Mutual failed to take necessary remedial actions.  This lawsuit seeks recovery of Liberty Mutual's excessive and unfair premiums.

10.      Accordingly, Plaintiff, on behalf of itself and others similarly situated, seeks to remedy Liberty Mutual's unfair business practices under California's unlawful competition law through disgorgement, restitution and constructive trust as to the excessive, unfair premiums, along with injunctive and other available relief.

## II.    Parties.

11.      Plaintiff Impressions Restaurant & Banquet Hall Inc. ("Impressions Restaurant" or "Impressions") is, and at all relevant times described herein was, a

3

California corporation, with its principal place of business in Glendale, California. Impressions Restaurant runs two full-service banquet halls located at 1132 E Broadway, Glendale, CA 91205 and 212 N Orange St, Glendale, CA 91203. From September 24, 2019 to September 24, 2020, Impressions Restaurant had a businessowners insurance policy in place with Liberty Mutual. Exhibit 1 (Businessowners Policy).

12.     Defendant Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Insurance Company is a wholly-owned subsidiary of Liberty Mutual Group Inc. At all relevant times, Liberty Mutual Insurance Company was engaged in the business of selling business insurance products in California and other states.

13.     Defendant Liberty Mutual Agency Corporation is a Delaware corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Agency Corporation is a subsidiary of Liberty Insurance Holdings, Inc., which is a subsidiary of the Liberty Mutual Insurance Company. At all relevant times, Liberty Mutual Agency Corporation was engaged in the business of selling business insurance products in California and other states.

14.     Defendant Liberty Mutual Group Inc. is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Defendant Liberty Mutual Group Inc. is the parent corporation of Liberty Mutual Insurance Company and grandparent corporation of Liberty Mutual Agency Corporation.

15.     Plaintiff is informed and believes that the Liberty Mutual Agency Corporation is beholden to and controlled by its grandparent corporations, Liberty Mutual Insurance Company and Liberty Mutual Group Inc., and turned over all or some of its premiums to Liberty Mutual Insurance Company and Liberty Mutual Group Inc. Similarly, Plaintiff is informed and believes that Liberty Mutual Insurance Company is beholden to and controlled by its parent corporation, Liberty Mutual Group Inc., and turned over all or some of its premiums to Liberty Mutual Group Inc.

16.     As stated above, Defendants are collectively referred to herein as "Liberty

4

Mutual" or the "Liberty Mutual Defendants."

**III.    Jurisdiction and venue.**

17.    This Court has jurisdiction over this action under 28 U.S.C. § 1332 and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) this is a class action with a class of more than 100 members; (ii) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (iii) minimal diversity exists because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

18.    This Court has personal jurisdiction over Liberty Mutual because they are: (i) authorized to, and have, conducted business in California; (ii) specifically marketed insurance products in California so as to constitute sufficient minimum contacts; and/or (iii) have sufficiently availed themselves of the California markets through the promotion, marketing, and sales of insurance products in this State to render the exercise of jurisdiction by this Court permissible.

19.    Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

**IV.    Additional allegations.**

**A.    COVID-19, ensuing health orders, and social distancing mandates caused California businessowners, including Liberty Mutual policyholders like Impressions Restaurant, to decrease their business operations.**

20.    The SARS-CoV-2 virus, known as COVID-19, severely impacted the world, including California.  The virus was first detected in Wuhan, China, in December 2019.  By January 2020, the virus was identified as COVID-19.  California declared a state of emergency on March 4, 2020, and the World Health Organization labeled the

COVID-19 outbreak a pandemic on March 11, 2020.

21. Beginning in March 2020, California counties began implementing shelter-in-place restrictions. On March 15, 2020, residents in counties throughout California were ordered to shelter in place and only go outside for food, medicine and other essentials. California Governor Gavin Newsom directed bars and nightclubs to close statewide.

22. On March 16, 2020, the Center for Disease Control and the national Coronavirus Task Force issued guidance for curbing the spread of COVID-19 titled "30 Days to Slow the Spread," which promoted the adoption of unprecedented social distancing measures.[2] These measures instructed various subsets of people to "not go to work," "stay home," "keep the entire household at home," and "stay … away from other people."

23. On March 19, 2020, California health authorities issued statewide shelter-in-place orders. The orders instructed California residents to stay at home and avoid public places except essential services.

24. Since then, as the virus spread, these orders and similar orders were periodically revised, extended, modified, lifted, and/or reinstated.

25. The national and statewide health orders caused many California businesses to substantially reduce their operations, or close their doors altogether. In enacting the Coronavirus Aid, Relief, and Economic Security (CARES) Act, the United States Congress found that approximately 43% of businesses had closed, and nearly all of these closures were due to COVID-19.[3]

26. For example, the restaurant and foodservice industries in California and nationwide were decimated by COVID-19 and the ensuing health orders. Prior to the pandemic, in 2019, California restaurants and foodservices provided approximately

---

[2] https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf
[3] https://www.pnas.org/doi/10.1073/pnas.2006991117

1,830,000 jobs across 76,201 locations statewide, which totaled estimated sales of $97.0 billion. [4]

27.    These numbers have decreased drastically.  For example, as of April 2020, over eight million restaurant employees nationally—nearly two thirds of the restaurant workforce—had been laid off or furloughed.[5]  By the end of April 2020, almost 40% of all restaurants across the country were shuttered, and the restaurant and foodservice industry lost over $80 billion in sales.[6]  California businesses were especially hard hit.  In California alone, estimated restaurant job losses as of 2021 from COVID-19 stood near 1 million.[7]

28.    In California, the pandemic resulted in more than 4.8 million unemployed citizens following business closures and layoffs. Yelp's Economic Impact Report (updated as of December 11, 2020), reported that more than 180,000 California businesses closed at the very beginning of the pandemic.  By the end of August 2020, 163,735 California business were still closed and 97,966 businesses were reporting that they would not be reopening.  Even as of February 28, 2022, Yelp's Economic Impact Report reflected that business openings were still slowed in cities across California due to new COVID-19 variants.[8]

29.    Plaintiff was one of many California businesses that saw its business operations decimated by COVID-19 and the ensuing health orders.  At the time when

---

[4]    Nat'l Restaurant Ass'n, California Restaurant Industry at a Glance (2019), available at https://www.senate.ca.gov/sites/senate.ca.gov/files/california_restaurant_statisticspdf.pdf

[5]    https://restaurant.org/education-and-resources/resource-library/restaurants-on-track-to-lose-$80-billion-in-sales-by-end-of-april;-8-million-employees-out-of-work/

[6]    *Id.*

[7]    California Restaurant Ass'n, Restaurants will be the last industry to recover from the pandemic (Mar. 15, 2021), available at https://www.calrest.org/news/restaurants-will-be-last-industry-recover-pandemic

[8]    https://www.yelpeconomicaverage.com/yea-q1-2022.html

Plaintiff obtained a businessowners policy from Liberty Mutual (on September 24, 2019), Plaintiff ran two successful banquet halls, had annual sales of over $400,000, and employed six full-time employees and multiple part time contractors, including a service staff, kitchen crew, and a janitorial crew.  Beginning in mid-March 2020, Plaintiff was forced to shut down its business and furlough its entire staff.  From March 2020 to March 2021, Plaintiff had no operations, no employees, and no revenue.

       **B.**     **Liberty Mutual was aware that (1) its businessowner policyholders' premiums were determined based on pre-COVID-19 information and thus provided Liberty Mutual with an inflated rate of return, and (2) California public policy required Liberty Mutual to lower or refund its premiums accordingly.**

     30.    Liberty Mutual is the fifth largest property and casualty insurance conglomerate in California and the fifth largest in the United States, writing policies generating over $36.1 billion in net premiums in 2021.[9]  During the time when its businessowner policyholders were forced to shutter their businesses during the pandemic, Liberty Mutual flourished.  According to Liberty Mutual's Fourth Quarter and Full Year 2020 Results, Net Written Premiums in 2020 "totaled $40.6 billion, an increase of 2.0%" from 2019.[10] Similarly, according to its Fourth Quarter and Full Year 2021 Results, Liberty Mutual's "[Net Written Premiums] in 2021 totaled $43.7 billion, an increase of 7.5%" from 2020.[11]

     31.    Liberty Mutual markets and sells businessowners insurance policies to California businesses, including through independent agents and brokers.  Liberty

---

[9]    https://www.reinsurancene.ws/top-100-u-s-property-casualty-insurance-companies/

[10]    https://www.libertymutualgroup.com/about-lm/investor-relations/documents/q4-2020-earnings-presentation.pdf-0

[11]    https://www.libertymutualgroup.com/about-lm/investor-relations/documents/q4-2021-earnings-presentation.pdf

Mutual sets premiums based on the anticipated risks associated with the insured business operations. Liberty Mutual uses various factors in calculating premiums, including the volume and type of business giving rise to the expected risks, the number of customers that frequent the business, and the type of work employees conduct at the premises. And Liberty Mutual requires policyholders, like Plaintiff, to provide accurate detailed information regarding its past and expected business operations and income.

32.    The information provided by a prospective policyholder allows Liberty Mutual to assess the risk associated with insuring that business and to determine its premiums accordingly. As Liberty Mutual itself explains "commercial policies are written based on estimated or fluctuating exposure bases" and relevant considerations "to properly classify and allocate [policyholder] exposures" can be found in "Payroll Records," and "Sales Journals or income statements." Exhibit 1 at 8.

33.    For example, if a business has larger operations—more employees or more customers patronizing the business—then the potential for an insured event increases, the insurer faces more risk, and the premiums will be higher to account for this greater risk. Conversely, if a business has diminished operations—fewer employees and fewer customers (or none at all) patronizing its business—then the potential for an insured event decreases, the insurer faces less risk, and the premiums should be lower.

34.    After Plaintiff provided the information required for Liberty Mutual to determine the appropriate risk and corresponding premiums, Liberty Mutual issued Plaintiff a businessowners policy on September 24, 2019. At that time, Liberty Mutual and Plaintiff were unaware that the COVID-19 pandemic and ensuing health orders would substantially reduce or eliminate the operations of California businesses, including Plaintiff's.

35.    After the COVID-19 pandemic began and the health orders were entered, Liberty Mutual became aware that the COVID-19 pandemic and ensuing health orders substantially reduced or eliminated the operations of many businessowner policyholders throughout California. Liberty Mutual was also aware that, when it calculated premiums

9

for these businessowner policyholders before the pandemic, Liberty Mutual had not contemplated or incorporated into its premiums that the policyholders' businesses would cease to operate or that their operations would be severely reduced.

36.     After the onset of COVID-19 in March 2020, many Liberty Mutual businessowner policyholders had fewer employees, less inventory, and fewer customers (or none at all) patronizing their businesses.  This reduced the potential for an insured event and decreased Liberty Mutual's risk.  To maintain a fair rate of return, Liberty Mutual needed to account for the decreased risk and reduce or refund premiums accordingly.  Failure to do so would result in an inflated rate of return, unjustly enriching Liberty Mutual and harming its policyholders.

37.     This is required by long-standing California public policy limiting insurance premiums and rates to a fair rate of return on the risk covered by the policy.  This public policy is confirmed by California Proposition 103, the California Code of Regulations, and the Orders of the California Department of Insurance.  Liberty Mutual has been aware of this public policy at all relevant times.

38.     In 1988, Californians voted Proposition 103 into law by referendum to uphold this public policy: "to protect consumers from arbitrary insurance rates and practices" and "to ensure that insurance is fair, available, and affordable for all Californians."[12]  The Proposition set forth that it "shall be liberally construed and applied in order to fully promote its underlying purpose." [13]

39.     According to the California Insurance Code, "No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter."  California Insurance Code 1861.05(a).  Insurers are limited to a fair rate of return, i.e., a profit limited to what an investor can reasonably expect to earn from an investment that has comparable risks in a business other than insurance. 10 Cal. Code Reg. § 2644.16; 10 Cal. Code Reg. § 2644.2.  The Regulations further

---

[12]     https://www.consumerwatchdog.org/feature/text-proposition-103
[13]     *Id.*

explain that an excessive rate of return, which an insurer cannot earn, is a return that exceeds a fair rate of return.  10 Cal. Code Reg. § 2644.1.

40.     In a series of bulletins following the outbreak of COVID-19, the California Department of Insurance (DOI) confirmed the policy that insurers are limited to a fair rate of return.  The DOI declared that, because policyholders were forced to decrease business operations during COVID-19, insurance companies like Liberty Mutual were receiving an excessive rate of return.  The DOI further declared that policyholders were entitled to a refund and/or reduced premiums.

41.     On April 13, 2020, the DOI issued a bulletin to insurers recognizing that "the COVID-19 pandemic caused an unprecedented challenge for California's businesses" and had "severely curtailed activities of policyholders in both personal and commercial lines," so that "projected loss exposures of many insurance policies have become overstated or misclassified."  Exhibit 2 (2020-3 Bulletin) at 1. [14]

42.     "To protect consumers and to provide consistent direction to the insurance industry regarding misclassifications of risk resulting from the COVID-19 pandemic," Insurance Commissioner Ricardo Lara ordered "insurers to make an initial premium refund for the months of March and April to all adversely impacted California policyholders," including those in commercial liability insurance, "as quickly as practicable, but in any event no later than 120 days after the date of this Bulletin," i.e., August 11, 2020.  2020-3 Bulletin at 1-2.  Commissioner Lara "grant[ed] each insurer reasonable flexibility in determining how best to quickly and fairly accomplish the refund of premium to policyholders," adding that "[i]nsurers may comply with the premium refund order by providing a premium credit, reduction, return of premium, or other appropriate premium adjustment."  *Id.* at 2.  "Insurers may refund premium without prior approval by the [DOI] if they apply a uniform premium reduction for all

---

[14]     Paragraphs 41-48 of this Complaint mirror the summary of the "DOI Bulletins" provided by Judge Orrick in *Boobuli's Llc v. State Farm Fire & Cas. Co.*, 562 F. Supp. 3d 469, 474-75 (N.D. Cal. 2021).

policyholders in an individual line of insurance, for recent, current, and upcoming policy periods or any portion thereof." *Id.*

43.    "Alternatively, insurers may refund premium without prior approval by the [DOI] by reassessing the classification and exposure bases of affected risks on a case-by-case basis for recent, current, and upcoming policy periods or any portion thereof." *Id.* "Whether choosing one of the above-described approaches, or an alternative approach, insurers shall, no later than 120 days after the date of this Bulletin, provide each affected policyholder, if applicable, with a notification of the amount of the refund, a check, premium credit, reduction, return of premium, or other appropriate premium adjustment." *Id.* at 3.  Commissioner Lara also ordered every insurer "to report to the [DOI] within 60 days . . . all actions taken and contemplated future actions to refund premiums in response to or consistent with this Bulletin." *Id.*

44.    On May 15, 2020, the DOI issued a second bulletin, extending "the directives set forth in Bulletin 2020-3 to reduce premium in the affected lines of insurance where the projected loss exposures have become overstated or misclassified . . . through May 31, 2020."  Exhibit 3 (2020-4 Bulletin) at 2.  The 2020-4 Bulletin also required insurers to report to the DOI "information with respect to any premium adjustments for May 2020."  *Id.*

45.    On June 25, 2020, the DOI issued a third bulletin, extending the directives and reporting requirements of the previous two bulletins to June 2020 and to "any months subsequent to June if the COVID-19 pandemic continues to result in projected loss exposures remaining overstated or misclassified."  Exhibit 4 (2020-8 Bulletin) at 2. The 2020-8 Bulletin clarified that, "[t]he extension of reporting required by this Bulletin 2020-8 does not change the previous deadline for insurers to provide direct relief to policyholders for March, April, and May premiums by no later than August 11, 2020."  *Id.*

46.    On December 3, 2020, the DOI amended Bulletin 2020-8 to extend the directives and reporting requirements set forth in Bulletins 2020-3 and 2020-4 "to

include premium relief for any months subsequent to June as conditions warrant." Exhibit 5 (2020-8 Amended Bulletin) at 1.

47.    On March 11, 2021, the DOI issued Bulletin 2021-3, reporting that "[t]o date, private passenger automobile insurance companies have returned more than $1.75 billion in premium for 2020 to California drivers," but "based on extensive analysis of data received, the Department's review of this loss data demonstrates the premium relief that insurance companies provided to their policyholders was insufficient, leaving consumers paying inflated premiums while they continue to experience reduced risk of loss."  Exhibit 6 (2021-3 Bulletin) at 1.

48.    Thus, the 2021-3 Bulletin "directs insurance companies," to take the following actions: (i) "Do more to return additional premium relief from March 2020 forward, and report these additional premium returns to the Department"; (ii) "Communicate with their policyholders about how they will return premiums, as well as options available to consumers to reduce their ongoing premium"; and (iii) "Consult this bulletin when seeking clarification regarding the directives and reporting requirements set forth here and in Bulletins 2020-3, 2020-4, and 2020-8." *Id.*

49.    Through this series of formal Bulletins, the California Insurance Commissioner put Liberty Mutual on notice that its then-current rates were excessive. Despite these Bulletins, Liberty Mutual failed to put in place and execute a refund program that was adequate to compensate its policyholders like Plaintiff for their overpayments.

**C.    Liberty Mutual unfairly collected and retained excessive premiums calculated based on its policyholders pre-COVID-19 operations instead of reducing and refunding the premiums to account for its policyholders' diminished operations.**

50.    As detailed above, Plaintiff and other similarly situated businesses paid premiums to insure against the risk associated with pre-COVID-19 business operations, even after the insured business operations had ceased or had been substantially reduced.

This resulted in Liberty Mutual collecting and retaining excessive, unfair premiums in violation of California public policy. Despite Liberty Mutual's policyholders' dramatic decrease in insured business operations caused by the COVID-19 pandemic, Liberty Mutual failed to reduce premiums fairly or refund the excess premiums reflecting the absent or decreased insured risks.

51.    In response to the Bulletins, Liberty Mutual stated that it issued a Businessowners Policy refund where "small commercial customers received a 15% refund of two months of their annual BOP premium." Exhibit 7 at 3.

52.    There are three problems with Liberty Mutual's response. First, the purported refunds do not sufficiently account for the reduced operations of policyholders and corresponding reduction in risks during these two months. Plaintiff, like many other policyholders, was altogether closed during this two-month period. It had no operations, no employees, and no customers. The reduction in risk to Liberty Mutual from Plaintiff's policy—and the corresponding reduction in premiums needed to maintain a fair rate of return—far exceeded 15%. Second, Liberty Mutual failed to provide the purported refunds for this two-month period, or even provide adequate notice that such refunds would be forthcoming. The California Insurance Commissioner ordered insurers like Liberty Mutual to "make an initial premium refund … as quickly as practicable, but in any event no later than 120 days after the date of this Bulletin," i.e., August 11, 2020. Exhibit 2 (2020-3 Bulletin) at 1-2. But the August 2020 deadline came and went, and now—more than two years later—Liberty Mutual still has not made the initial refund. Instead, Liberty Mutual states on its website that its initial refunds for California businesses are "awaiting regulatory approvals." Exhibit 7 at. 3. But Liberty Mutual has not explained to its customers why these purported regulatory hurdles have prevented Liberty Mutual from meeting the deadline (by more than two years). Liberty Mutual has not sent Plaintiff and similarly situated businesses any correspondence at all to inform them that they will be receiving an initial refund. Third, the purported initial refund only covers two months of Plaintiff's premiums, and ignores

14

the subsequent months during the pendency of Plaintiff's policy with Liberty Mutual
when Plaintiff's business was altogether closed with no operations.  Liberty Mutual
unjustly profited at the expense of Plaintiff and similarly situated businesses who had
reduced operations during additional months beyond the two-month window.

53.    Liberty Mutual's collection and retention of such excessive premiums
violates California public policy and contravenes Proposition 103's mandate to protect
consumers from arbitrary insurance practices and to ensure that insurance is fair,
available, and affordable for all.

54.    Liberty Mutual's collection and retention of returns in excess of a fair rate
of return also violates California's laws against unfair business practices under section
17200 of the Business and Professions Code.

55.    Plaintiff seeks to restore excessive, unfair premiums (and the earnings
thereon), through disgorgement, restitution and a constructive trust.

**V.    Class action allegations.**

56.    Plaintiff brings its claims individually and on behalf of the following class:
All persons who paid insurance premiums to Liberty Mutual for businessowners
insurance policies, covering operations after March 15, 2020, whose business operations
were substantially reduced or eliminated due to the COVID-19 pandemic.

57.    The following people are excluded from the class and the subclasses: (1)
any Judge or Magistrate Judge presiding over this action and the members of their
family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and
any entity in which the Defendants or its parents have a controlling interest and their
current employees, officers and directors; (3) persons who properly execute and file a
timely request for exclusion from the Class; (4) persons whose claims in this matter have
been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and
Defendants' counsel, and their experts and consultants; and (6) the legal representatives,
successors, and assignees of any excluded persons.

*Numerosity*

58.    The proposed class contains members so numerous that separate joinder of each member of the class is impractical.  Class members can be readily identified, including though records maintained by Liberty Mutual.

*Commonality*

59.    There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation

- Whether Liberty Mutual's practice of charging and retaining excess premiums during the COVID-19 pandemic was "unfair" within the meaning of section 17200 of the Business and Professions Code; and

- Whether Class members lost money or property as a result of Liberty Mutual's unfair business practice in violation of section 17200 of the Business and Professions Code.

- Whether the members of the Class paid excessive premiums to Liberty Mutual;

- Whether Liberty Mutual failed to fairly take into account the substantial reduction in its policyholders' insured business operations and Liberty Mutual's corresponding reduction in risk during the COVID-19 pandemic when determining premiums or refunds on premiums;

- Whether the members of the Class are entitled to recover the premiums paid in excess of the amounts allowed by California public policy given the reduction in their insured business operations and Liberty Mutual's corresponding reduction in risk, plus interest;

- The appropriate nature of and procedure for providing class-wide relief.

*Typicality*

60.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff, like other Class members, has paid premiums that exceed Liberty Mutual's fair rate of return for the risk taken.  Plaintiff's claims therefore arise from a common course of conduct by Liberty Mutual and are based on the same legal theories.  Proof of a common or single

16

state of facts will establish the right of each member of the Class to judgment because Liberty Mutual's practice violates California law and public policy, as stated herein, and will be applicable to all members of the Class.  Upon application by Plaintiff's counsel for certification of the class, as and where necessary as to the following causes of action, the Court may be requested to also incorporate subclasses in the interests of justice and the judicial economy.

### Predominance and Superiority

61.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is clearly impractical.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals claim filings and actions would engender.  Furthermore, given that the restitution amount suffered and/or demanded by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them. Moreover, individualized claims and litigation would present the potential for inconsistent or contradictory outcomes.  The class action device presents fewer management difficulties, requiring only a single adjudication of the complex legal and factual issues in this dispute, thereby providing the benefits of economy of scale and comprehensive supervision by a single court.

## VI.    Claims

### Count 1: Unjust Enrichment
### (on behalf of Plaintiff and the Class)

62.    Plaintiff realleges and incorporates by reference all of the foregoing paragraphs as if set forth herein.

63.    Plaintiff and the Class purchased businessowners insurance policies from Liberty Mutual, covering risks faced by Plaintiff's business operations.

17

64.    Plaintiff and the Class submitted insurance applications describing among other things, their business operations, revenue, and other details to enable Liberty Mutual to evaluate the risk of covering Plaintiff and Class members' respective business operations and set a premium allowing a fair rate of return as authorized under California public policy.  Plaintiff and Class members also agreed to subject their businesses to audits to verify the accuracy of representations regarding the type, volume and location of insured business operations.

65.    Plaintiff is informed and believes that the Liberty Mutual Agency Corporation is beholden to and controlled by its grandparent corporations, Liberty Mutual Insurance Company and Liberty Mutual Group Inc., and turned over all or some of its premiums to Liberty Mutual Insurance Company and Liberty Mutual Group Inc. Similarly, Plaintiff is informed and believes that Liberty Mutual Insurance Company is beholden to and controlled by its parent corporation, Liberty Mutual Group Inc., and turned over all or some of its premiums to Liberty Mutual Group Inc.

66.    As a result of the COVID-19 pandemic and ensuing health orders, the insured business operations of Plaintiff and the Class decreased dramatically, but Liberty Mutual continued to charge and collect excessive, unfair premiums and failed to voluntarily return the excessive, unfair premiums.

67.    Liberty Mutual's collection and failure to refund the excessive, unfair premiums has unjustly enriched it, and Plaintiff and Class members are entitled to restitution of such excessive, unfair premiums and Liberty Mutual's investment returns on those excessive, unfair premiums.  Further, Plaintiff and the Class request a constructive trust on those excessive, unfair premiums (and Defendants' gains on those funds) and an award of their attorney's fees and costs incurred for this matter.

**Count 2: Violation of Business and Professions Code § 17200, et seq.**
**(on behalf of Plaintiff and the Class)**

68.    Plaintiff realleges and incorporates by reference all of the foregoing paragraphs as if set forth herein.

69. Liberty Mutual provided businessowners insurance policies to Plaintiff and Class members, insuring against certain risks, most of which were related to the use of their respective commercial premises. Consistent with California public policy, Liberty Mutual initially charged premiums that covered the risk and presumably included a fair rate of return for the risk insured.

70. Beginning in mid-March 2020, California authorities issued a series of shelter-in-place orders preventing or significantly reducing the ability of Plaintiff and Class members, through no fault of their own, to operate their respective businesses and conduct business at their respective insured commercial premises. As a result, the risks insured by Liberty Mutual were substantially reduced. Despite the substantial reduction in the insured risk, Liberty Mutual continued to charge (and failed to refund) premiums that were calculated based on the pre-pandemic business operations and use of the insured premises. This has resulted in Liberty Mutual charging, receiving, and retaining excessive, unfair premiums in violation of California public policy.

71. California has a long-standing public policy limiting an insurer's ability to impose rates in excess of a fair rate of return on the insured risk, reflected in California statutes and regulations.

72. Liberty Mutual's conduct in charging and retaining premiums for a risk that no longer exists, or has been substantially reduced, violates this vital public policy and the intent of the statutes and regulations designed to ensure that the rates charged by insurers relate to the risk insured and are limited to a fair rate of return on insuring that risk. Plaintiff and Class members' inability to conduct business operations due to the pandemic and ensuing health orders was not one of the factors Liberty Mutual used to calculate insurance rates or premiums. Because it collected and retained premiums calculated based on substantially greater risks than actually existed during the pandemic, Liberty Mutual experienced a windfall. The harm to Plaintiff and the Class substantially outweighs any benefit or utility of Defendants' unfair business practice of collecting excessive, unfair premiums.

73.    Plaintiff and Class members have no adequate remedy at law.

74.    As a result of Liberty Mutual's unfair business practices, Plaintiff and Class members have lost money or property and suffered injury in fact.  For example, Plaintiff paid thousands of dollars in premiums to Liberty Mutual based on Plaintiff's pre-COVID-19 business operations. After the substantial reduction or elimination of the insured risks, Liberty Mutual continued to hold and charge excessive, unfair premiums rightfully belonging to Plaintiff (and the Class).

75.    Plaintiff and Class members have been damaged by Liberty Mutual's unfair business practices and are entitled to the relief described below, including the restoration of excessive, unfair premiums charged in violation of California public policy.

## VII.  Jury Demand.

76.    Plaintiff demands a jury trial on all issues so triable.

## VIII.  Prayer for Relief.

77.    Plaintiff seeks the following relief individually and for the proposed Class:

- An order certifying the asserted claims, or issues raised, as a class action;
- A judgment in favor of Plaintiff and the proposed Class;
- An order and judgment under the court's equitable powers for disgorgement, restitution and a constructive trust as to the excessive, unfair premiums acquired from Plaintiff and the Class along with any economic gains Defendants derived from investing those excessive, unfair premiums
- Attorneys' fees;
- Pre- and post-judgment interest;
- Any additional relief that the Court deems reasonable and just.

1     Dated: January 31, 2023                  Respectfully submitted,

2

3                                             By: */s/ Richard Lyon*

                                            Richard Lyon (Cal. Bar No. 229288)

4                                             rick@dovel.com

                                            Jonas B. Jacobson (Cal. Bar No. 269912)

5                                             jonas@dovel.com

6                                             Simon Franzini (Cal. Bar No. 287631)

                                            simon@dovel.com

7                                             DOVEL & LUNER, LLP

8                                             201 Santa Monica Blvd., Suite 600

                                            Santa Monica, California 90401

9                                             Telephone: (310) 656-7066

10                                            Facsimile: (310) 656-7069

11                                             David A. Neiman

12                                             dneiman@rblaw.net

                                            ROMANUCCI & BLANDIN, LLC

13                                             321 North Clark Street, Suite 900

14                                             Chicago, IL 60654

                                            Telephone: (312) 458-1000

15                                             Facsimile: (312) 458-1004

16

17                                             *Attorneys for Plaintiff and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28